



United States Courts
Southern District of Texas
ENTERED

DEC 2 4 2003

Michael N. Milby, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

EL AGUILA FOOD PRODUCTS INC., §
ET AL §
    PLAINTIFFS, §
VS. §
 §   CIVIL ACTION NO. H-03-0427
 §
GRUMA CORPORATION, §
INDIVIDUALLY D/B/A MISSION FOODS §
CORPORATION, ET AL §
    DEFENDANTS. §

---

## MEMORANDUM OPINION

---

### I.

**A. INTRODUCTION**

.

173

Before the Court are Gruma's[1] motion for summary judgment, motions to exclude and strike the testimony of the plaintiffs' experts, motion for a directed verdict on the plaintiffs'[2] case as a whole, motion to dismiss for lack of standing as to Gilbert Moreno Enterprises and Sanitary and Tortilla Manufacturing, Ltd., and its cross-claim for judgment against JCFW, Inc., d/b/a Caliente Distributors ("Caliente") for a past due account.

The Court has reviewed the various motions and is of the opinion that Gruma's motions for summary judgment and for directed verdict are meritorious and should be granted.  The Court also finds and holds that Gruma's motions to exclude expert testimony should be granted, that Gilberto Moreno Enterprises and Sanitary Tortilla Manufacturing Ltd., lack standing to maintain a suit against Gruma, and that Gruma is entitled to a judgment against Caliente.  However, because Gruma seeks dismissal of its counterclaims, pursuant to FRCP Rule 41, no judgment on those claims will be entered.  Hence, the Court enters judgment that the plaintiffs take nothing by their suit and that Gruma's counterclaims be dismissed without prejudice.

---

[1]The defendants are Gruma Corporation, individually, as successor to Mission Foods Corporation and Guerrero Mexican Food Products, Inc., and d/b/a Mission Foods Corporation and Guerrero Mexican Food Products, and Azteca Milling LP.  These defendants are collectively referred to as Gruma.

In the plaintiffs' original pleadings, various plaintiffs brought suit against Bimbo Bakeries USA, Inc., Tia Rosa Bakery of Texas, Inc., and Mrs. Baird's Bakeries Business Trust.  These defendants were dismissed pursuant to a settlement.  *See* Instrument No. 46.

[2]The plaintiffs are El Aguila Food Products, Inc.; La Ranchera Food Products, Inc., La Reina, Inc.; Anita's Mexican Foods Corp.; La Espiga De Oro, Inc.; Gilbert Moreno Enterprises, Inc. d/b/a La Monita; La Favorita Incorporated; Mex-Pro, Inc.; La Tapatia Tortilleria, Inc.; Marbros LLC d/b/a El Rancho; Food-O-Mex Corp. d/b/a El Dorado Mexican Food Products; R and M Partnership d/b/a Capistran Tortillas; Walter Molina d/b/a Dos Molinos Tortilla Heaven; California Mexican Foods, Inc.; Mexican Food Specialties, Inc.; Sanitary Tortilla Manufacturing, Ltd.; JCFW, Inc. d/b/a Caliente Distributors; and Lompoc Tortilla Shop.

## B.   BACKGROUND AND CONTENTIONS OF THE PARTIES

This antitrust suit challenges the propriety of Gruma's conduct as it competes in the marketplace for the retail sale of tortillas.  The plaintiffs contend that the relevant product market is the retail sale of tortillas and that the relevant geographic market is northern and southern California, Arizona, Texas and Michigan.  The Court need not accept the plaintiffs' position concerning the relevant market in order to address Gruma's motions.  However, the Court is fully aware that Gruma disagrees, arguing that the product market should include chips and bread products and the geographic market should be the entire United States.  Prior to addressing the issues, the Court will present the parties contentions, essentially as stated in the Joint Pretrial Conference Order.

### 1.   The Plaintiffs' Contentions

The plaintiffs contend that this is a case about maintaining free, fair and honest competition in the market for the retail sale of tortillas. Stated differently, the plaintiffs allege that Gruma has violated Sections 1 and 2 of the Sherman Act by using exclusionary conduct for the purpose of monopolizing or attempting to monopolize the retail sale of tortillas in the relevant product market.  The plaintiffs define the relevant market as consisting of two components, a relevant product and a relevant geographic market.  They allege that the relevant product is the retail sale of tortillas and that the relevant geographic markets are southern California, northern California, Houston, Arizona and Michigan.

According to the plaintiffs, Gruma has utilized Customer Marketing Agreements[3] [CMA Agreements] with retailers in each of these relevant geographic markets to unreasonably restrain trade or exclude competition in violation of Section 1 of the Sherman Act. The plaintiffs allege that Gruma accomplished this through CMA Agreements with retailers whereby Gruma made "up-front" monetary payments [slotting fees] or provided financial incentives to retailers for the purpose of managing and controlling retail placement and activity of competing products. Such conduct, according to the plaintiffs, is exclusionary conduct violative of antitrust laws that permits Gruma to gain or maintain "market power"[4] in each of these relevant geographic markets. Through these financial incentives, Gruma is allowed to manage or control the placement, location, availability, visibility and promotional activity of competing retail tortillas.[5]

The plaintiffs also contend that Gruma's exclusionary conduct involves actions as category captain[6] in preparing, providing or influencing the schematics or diagrams showing

---

[3]The CMA Agreement has been regularly used in other product markets. It appears to have come of age in the tortilla market in the early to mid-90s. It generally speaks to product placement in the store, shelf space, and financial incentives to the retailers.

[4]"Market power" is the power to control prices or exclude competition. The "inquiry is to determine whether an arrangement has the potential for genuine adverse affects on competition. *See Great Western Directories v. S.W. Bell Telephone*, 63 F.3d 1378, 1384 (5th Cir. 1995) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

[5]As part of the CMA negotiations, the plaintiffs and Gruma seek, to be named "category captain." Category captains assist the retailer in organizing the products by preparing schematics for placement of the products on shelves and in the store in general. The plaintiff asserts that when Gruma acts as category captain, they have little or no input, in the category design, and are placed in unfavorable positions on the shelves. The plaintiffs admit that the retailers, not Gruma, approve placements.

[6]A "category captain" is a leading supplier's employee who is responsible for recommending to the retailer an optimal product mix and promotional plans for a particular product category. *See* [*Slotting Allowances in Retail Grocery Industry–FTC Study, II(B)(3) Nov. 2003*]

4

the placement and location of not only the defendants' tortillas but also the competition's tortillas. Because of Gruma's conduct in each of the relevant geographic markets, the opportunities of the plaintiffs, and other competitors of Gruma, have been impaired for reasons other than competition on the merits. The plaintiffs further allege that the defendants' conduct has affected the quantity, quality, variety, choice and price that consumers pay for tortillas.

The plaintiffs also contend that Gruma has violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the retail tortilla market. [This contention relies on the same facts and proof as the plaintiffs' Section 1 claim.] The plaintiffs further allege that Gruma has engaged in discriminatory practices in violation of the Robinson-Patman Act either by paying something of value to retailers or by requiring the plaintiffs to purchase corn flour at different prices in different states. The nature and extent of this claim is not quite clear. The plaintiffs assert that one or more of these violations has been a material cause of injury to the plaintiffs' business or property and that the plaintiffs are entitled to recovery damages for the injury and harm caused to their business or property. The injury and harm alleged has resulted in lost profits in the past continuing up through trial, increased cost and expenses, and lost future profits.

Finally, the plaintiffs contend that they are entitled to injunctive relief under the terms of Section 16 of the Clayton Act. Section 16 of the Clayton Act provides that any person, firm, corporation or association shall be entitled to injunctive relief against threatened loss

or damage caused by a violation of the antitrust laws. *See* 15 U.S.C. § 26.  The plaintiffs

seek appropriate injunctive relief and request that the Court consider appropriate equitable

remedies.

> 2.    *Gruma's Contentions*

Gruma has cast this case as one about business competition for retail store shelf

space.  With few exceptions, the parties manufacture and sell tortillas where competition for

shelf space is intense.  Gruma contends that the plaintiffs have admitted that competition is

intense and that the manufacturers of tortillas and other products strive to increase their shelf

space in the retail stores.[7]   According to Gruma, what the plaintiffs are experiencing is

simply competition in a growing market.

Gruma points out that the plaintiffs have no legitimate complaint about Gruma's

incentive, rebate, and discount programs, including programs that pay retailers for shelf

space.  According to Gruma, these programs reduce the price paid by retailers.  Hence, the

programs are beneficial and promote competition, lower prices and increase the availability

of products to consumers.  Gruma also directs attention to federal government data that it

contends confirms that tortilla prices have remained low throughout the period that CMA

Agreements have been used.  Because prices have remained low, Gruma surmises that the

plaintiffs brought this suit in an effort to raise the price of tortilla products to consumers so

---

[7]Gruma markets its tortilla products under the names, Mission, Guerrero and La Predilecta.

that they, the plaintiffs, could enjoy greater profits.  Thus, it is the flat market prices that are causing the plaintiffs to lose profits and market share.

Gruma notes that the plaintiffs can afford to make similar agreements with retailers if they choose to do so.  And, the retailers have invited competitive offers from the plaintiffs. However, argues Gruma, the plaintiffs prefer to maintain their profit margins and seek to "turn the clock back to the time when price competition was considered unsportsmanlike." According to Gruma, the plaintiffs openly complain about Gruma's low prices as an effort to drive them from the market.  However, argues Gruma, it has always sold its products to retailers at a price in excess of its cost.

Gruma also argues that it does not have "market power" in the relevant market for a number of reasons. First, Gruma contends that the plaintiffs' relevant product market is wrong.  The relevant product market, according to Gruma, is shelf space in retail stores. Thus, Gruma argues that the retail tortilla market should include all tortillas products - not just those sold in supermarkets.  According to Gruma, a tortilla is a tortilla whether the truck delivers it to a grocery store or a restaurant, or whether it is made into a tortilla or a chip. Moreover, Gruma argues, the relevant product market includes tortillas in all forms: fresh tortillas, tortilla chips, taco shells, tostadas and other similar products, all of which come off the assembly line as tortillas.

Finally, Gruma argues that there are no significant barriers to entry into the tortilla market.  According to Gruma, the evidence shows, abundantly, that barriers to entry are very

low.  Relying on the boasts from several plaintiffs that they had humble beginnings, Gruma contends that no one company can control the tortilla market.  A new manufacturer could easily enter the market and undercut any attempts to raise prices.  As an example,  Gruma points out that many grocery stores have entered the tortilla market by installing in-store tortilla machines.  Hence, the in-store tortilla machine phenomenon, which guarantees fresh hot tortillas, is proof that there are no barriers to entry into the market.

With these contentions and their attendant arguments, the Court now addresses these issues starting with the defendants' limitation and standing claims.

## II.

The Court recognizes that this is a complex case that raises many and varied issues. Thus, the Court has organized this Memorandum to address the issues from Gruma's perspective as follows: (1) Gruma's Statute of Limitations defense generally; (2) limitations claim to  La Ranchera's tortious interference claim; (3) claim of lack of standing as to Gilbert Moreno Enterprises and Sanitary Tortilla Company; (4) motions to exclude the testimony of the plaintiffs' expert witness; (5) motion to exclude the testimony of the plaintiffs' expert witnesses; (6) motion for summary judgment; and, (7) Rule 50 and 52 motions for judgment at the conclusion of the plaintiffs' evidentiary presentation. The Court will address the first three (3) of these claims in this section.

## A.    GRUMA'S LIMITATION AND STANDING DEFENSES

It appears from the summary judgment and response as well as the trial evidence that Gruma claims that: (1) the Statute of Limitations bars or limits the recovery sought by the plaintiffs; (2) La Ranchera's claim for tortious interference is barred by limitations; and, (3) Gilbert Moreno Enterprises and Sanitary Tortilla Company lack standing to bring suit.

Regarding the first claim Gruma contends that:  (a) the claims of El Aguila Foods Products, Inc., La Ranchera Food Products, Inc., La Reina, Inc., Anita's Mexican Foods Corp., and La Espiga De Oro, Inc., that may exist prior to July 17, 1997, are barred by limitations; (b) the claims of Gilbert Moreno Enterprises, Inc., d/b/a Monita, La Favorita, Incorporated, Mex-Pro, Inc., La Tapatia Tortilleria, Inc., Marbros LLC d/b/a El Rancho and Food-O-Mex Corp., d/b/a El Dorado Mexican Food Products, that may exist prior to September 7, 1997, are barred by limitations; and (a) the claims of Capistran, Inc., Dos Molinos Tortilla Heaven, Inc., California Mexican Foods, Inc., Mexican Food Specialities, Inc., Sanitary Tortilla Manufacturing Company, JCFW, Inc. d/b/a Caliente Distributors and Lompoc Tortilla Shop, that may exist prior to February 11, 1998, are barred by limitations.

The facts show that the first group of plaintiffs filed suit on July 17, 2001,  that the second group filed suit on September 7, 2001; and, that the third group filed suit on February 11, 2002.  The plaintiffs' statutory claims under the Sherman Act, Clayton Act, Robinson-Patman Act, as well as the complimentary state law claims, must be brought within four years of the injury that gives rise to the cause of action.  *See Kaiser Aluminum*

*& Chem., Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045; 1050-51 (5th Cir. 1982);

*see also* TEX. BUS. & COMM. CODE ANN. § 15.25(a) (Vernon 2001); CAL. BUS. & PROF.

CODE ANN. § 16750.1 (Deering 2002); MICH. COMP. LAWS § 445.781 (2003) and ARIZ.

REV. STAT. § 44.1410 (2003).   The plaintiffs have not challenged Gruma's limitations

claims.   Hence, the Court HOLDS that the plaintiffs' state and federal claims, that seek

damages earlier than July 17, 1997, for the first group;  September 7, 1997, for the second

group; and February 11, 1998, for the third group, are barred.

Also, La Ranchera's claims for tortious-interference that were filed under state law

and under the Unfair Practices Act statutes of California are barred.   Here, the evidence is

undisputed that La Ranchera was fully aware of its claim but failed to timely bring suit.

Therefore, these claims are dismissed with prejudice.

Finally, Gruma asserts that both, Gilbert Moreno Enterprises d/b/a La Monita and

Sanitary Tortilla Company, lack standing to bring their suits. The testimony of Moreno

shows that he sold the assets of his company to Authentic Specialty Foods on September 23,

1997.  In this circumstance, Moreno's suit ended with the sale of his business.  There is no

evidence that he retained any ownership interest in Moreno Enterprises or that Moreno

Enterprises currently exists as a viable company.   Moreno admits that he sold all of the

company's assets to Authentic.   Therefore, the Court holds that neither the company nor

Moreno individually has standing to bring or maintain a suit against Gruma.  The Gilbert

Moreno Enterprises suit is dismissed with prejudice.

Sanitary Tortilla Company also joined the plaintiffs in bringing suit against Gruma. However, the evidence is undisputed that Sanitary has not sold tortillas in the retail market in the last 20 years. When questioned about his plans to enter the retail sales market in the future, Villareal testified that he was satisfied with his business "niche," and that he had no current plan to enter the retail market. Based on these facts, the Court holds that Sanitary has no standing to bring or maintain a suit. Therefore, Sanitary Tortilla Company's suit is dismissed with prejudice.

## III.

### A.    THE LEGAL STANDARD EXPERT WITNESSES

Gruma, through motions to exclude[8] and a motion *in limine*, seeks to exclude the plaintiffs' experts witness' testimony based on the Supreme Court's holding in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993). *Daubert* and its progeny require that opinion testimony meet every requirement of Rule 702[9] of the Federal Rules of Evidence. Thus, the case law instructs the trial judge, as "gatekeeper," to insure that a proper

---

[8]Previously, the Court summarily denied the defendants' motions to strike and announced that the motion for summary judgment would be carried with the trial. However, the Court never intended to deny the defendants the opportunity to test the propriety of admitting the testimony of the plaintiffs' experts. Hence, the Court for convenience denied the defendants' motion *in limine* awaiting proffers. As the record stands, the Court has now heard the testimony of the plaintiffs' witnesses and, outside the presence of the jury, received the plaintiffs' expert testimony proffers.

[9]Rule 702 instructs:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and, (3) the witness has applied the principles and methods reliably to the facts of the case.

application of Rule 702 is made in evaluating expert witness testimony. Hence, the Supreme Court requires that expert testimony meet the standards of *relevancy* and *reliability* before a jury or fact finder may use it in determining an issue of fact. *Daubert*, 509 U.S. at 589; *Seatrax, Inc., v. Sonbect Int'l, Inc.*, 200 F.3d 358 (5th Cir. 2000).

The issue of *relevancy* requires the Court to find that the opinion offered "fits" the facts that are presented to the fact finder. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998 (*en banc*)). In other words, there must be a connection between the expert's opinion and the fact testimony. *Id.* However, a difference of opinion as to the nature of the "fit," or the inferences to be drawn from an application of the "fit," is not a basis to exclude an expert's testimony. *See Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999).

Gruma also challenges the *reliability* of the plaintiffs' expert witnesses' opinions. In this regard, Gruma argues that subjective belief and unsupported speculation destroy reliability and, therefore, an opinion based on such does not satisfy the strictures of Rule 702 or *Daubert*. The type of scrutiny required by Rule 702 dictates that a causation expert establish a law violation and causal connection between the violation and the injury that forms the basis for the complaint. This showing is particularly elusive in an antitrust case because the fact that a party may suffer injury does not automatically establish that the injury is an antitrust injury. Antitrust damages flow from an antitrust injury, not simply because a party sustains a loss. *See Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213 F.3d 198 (5th Cir. 2000).

The plaintiffs have sought to prove antitrust damage by the "before and after" method. This method, however, does not exclude the plaintiff's duty to prove an antitrust injury. Gruma's motions and the Court's focus are on whether Dr. Gundlach's testimony establishes an antitrust violation and injury. Hence, the primary issue before the Court is whether Gruma's CMA Agreements have created a monopoly or attempts to create a monopoly in violation of Sections 1 and 2 of the Sherman Act and whether, as a result, the plaintiffs have suffered loss sales.

## B.    THE PROFFER OF DOCTOR GUNDLACH ON CAUSATION

The Court is of the opinion that the expert evidence fails because there is no evidence of an antitrust injury. Therefore, Dr. Gundlach's testimony should be excluded from jury's consideration. It follows that, in the absence of an antitrust injury, no private action will lie in law or equity. *See Valley Products Company, Inc., vs. Landmark,* 128 F.3d 398, 402 (6th Cir. 1997). Likewise, in the absence of an antitrust injury, no injunctive relief is available under § 16 of the Clayton Act. *Id.* The Court is of the opinion that the necessary directness is missing in Dr. Gundlach's testimony and, therefore, Dr. McCoin's damage calculations that assume that Dr. Gundlach's testimony establishes a causal connection, is inadmissible hearsay evidence based on unsupported assumptions.[10]

---

[10]To the extent that there is hearsay evidence concerning what the retailers thought or said, that evidence is stricken from the record. Such evidence was opposed and, if admitted at all, was admitted improvidently or for a limited purpose and not for the truth of the statements.

13

The plaintiffs' marketing expert is Dr. Gregory T. Gundlach.  Gruma asserts that his testimony should be excluded because:  (a) his testimony contradicts Supreme Court and Fifth Circuit law; and, (b) he relies on unsupported assumptions concerning Gruma's CMA Agreements with retailers rather than the actual documents.  Hence, Gruma asserts that Dr. Gundlach has failed to quantify the instances in which Gruma has acted as "category captain, had exclusive promotions or has 100% of the retailer's shelf space for tortillas.  Finally, Gruma argues that his opinion fails to establish that Gruma has more shelf space than the "space-to-sales" data reveal.

In general, the question Dr. Gundlach addressed, in his own words, is "whether or not [the] contractual rights and [ ] understandings and the way that they incentivize retailers. . . offends the principles of free competition and whether or not they also benefit consumers."  With the knowledge that slotting fees are paid by Gruma in a limited number of stores, by some of the plaintiffs in a limited number of stores and knowledge that such fees are generally paid in all retail markets, Dr. Gundlach opines:

1. that the market definition in this case, on the product side, is fresh baked tortillas at retail including those . . . within the refrigerated category;

2. that the major geographic markets are northern and southern California, Arizona, Texas and an emerging market in Michigan; and,

3. that Gruma has "market power" in each of the submarkets as a result of its ability to utilize contractual and oral arrangements to "lock up and dominate and exclude" competitors in the marketplace.

14

Thus, he concludes that slotting agreements, category management, and pricing strategy permit Gruma to exercise market power. [*See* Gundlach's Chart Summary].

It is well known that the retailers and manufacturers engage in negotiations that result in the payment of slotting promotionals, co-op advertising, and other allowances or discounts that favor the retailers. *See* [*Slotting Allowances in the Retail Grocery Industry FTC Study–Executive Summary*, Nov. 2003].[11] Thus, Dr. Gundlach recognizes that slotting fees, advertising, allowances, and discounts are part of the mix in the competition arena between competing products, manufacturers, and retailers. Dr. Gundlach also recognizes that the use of slotting fees, in negotiating space allocation and assignments, is not a *per se* violation of the antitrust laws. And, the plaintiffs admit as much.

Thus, while he admits that a slotting fee payment is lawful, he argues that Gruma has used them in an unlawful way to restrict the space available to its competitors. In this regard, he argues that slotting fee payment have resulted in exclusivity, permitted greater display space than sales dictate, and permitted preferential space and display positions that restrict competitive promotions. These opinions are unfound, as they do not rely upon the facts of this case.

Dr. Gundlach's proffer revealed that he did not interview any buyer for any retailer, particularly those who made the decision concerning Gruma's CMA Agreements. The evidence is undisputed that these Agreements were in writing and therefore available to Dr.

---

[11]Dr. Gundlach participated in the cumulation of data that resulted in this report. In fact, he has been studying the effects of slotting fees and other incentives paid to retailer on the tortilla market and others for over 10 years.

Gundlach. However, except for the summary judgment evidence, which Dr. Gundlach ignored, his report and the plaintiffs' testimony fail to consider the "give and take" evident in the ultimate terms of Gruma's CMA Agreements.

Also, the evidence fails to quantify the extent of any exclusivity that Gruma allegedly has in the marketplace. The Supreme Court has held that exclusivity must be quantified in order to determine its impact. In *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), where exclusivity was an issue, the Supreme Court considered the structure of the market, the number of sellers and buyers in the market, and the volume of their business as important factors in determining the effects of exclusivity. *Id*. at 45. Thus, exclusivity is not *per se* unlawful and does not exist simply because one or more chain stores choose to deal with Gruma and other tortilla manufacturers who are non-plaintiffs. Exclusivity must result in an unreasonable restraint on trade where a significant fraction of the [manufacturers] are frozen out of a market by the exclusive deal. *Id*. The evidence fails to establish that Gruma has exclusivity, its significance in relation to the retail market for tortillas, and how Gruma's exclusivity affected the competition. Moreover, there is no evidence distinguishing the effects on the market of any exclusivity held by Gruma as over against similar agreements held by the plaintiffs or other tortilla manufacturers.

Likewise, the evidence fails to establish that Gruma's CMA Agreements are the reason that some of the plaintiffs' are suffering loss of shelf space with retailers. Many of the plaintiffs have never had shelf space in the chain stores. Others have never tried to

16

obtain shelf space.  Hence, the evidence fails to establish that the plaintiffs are frozen out

of the market because of Gruma's CMA Agreements.  The plaintiffs' proof of exclusivity

is also hindered by their own conduct.  The plaintiffs have refused, based on principle, to

negotiate with retailers for shelf space.  Thus, the plaintiffs' evidence suffers a self-inflicted

wound.

Finally, the evidence fails to show what the retailers' demands and needs were when

they entered into CMA Agreements with Gruma.  As part of its summary judgment

evidence[12], Gruma proffered declarations of senior officials in the various retail chain stores

as evidence that Gruma's CMA Agreements did not constitute predatory conduct and,

therefore, did not violate antitrust laws.  The store chains from which affidavit proffers were

obtained included:[13]  Albertsons, Cox's Foodarama, Panchos Meat Markets, Food Maxx,

Ralphs Grocery Company and Food 4 Less Supermarkets, Lucky and American Stores

Company, El Super, Superior Super Warehouse, Tresierras, Kroger Company, Meijer Stores,

Vons, and Southwest Supermarkets.  The supermarkets are located in northern and southern

California, Texas, Arizona and Michigan.  While the affidavit proffers are not identical in

all respects, they address the issues of slotting fees, advertising, allowances and promotions

---

[12]The plaintiffs argue that considering Gruma's summary judgment and, thus the summary judgment evidence is improper at this point in time.  This position overlooks the fact that to do so is not improper.  Moreover, had Gruma presented its witnesses, the same evidence would have been presented.  The plaintiffs had no evidence that contradicts the retailers' statements.

[13]Gruma presented in its summary judgment evidence some 19 declarations from the presidents, vice-president and directors of purchasing concerning Gruma's CMA Agreements, the limitation on space, placement of product, the meaning of terms used and the benefits to the retailer and its customers.  *See* [Appendix to Summary Judgment, Ex. 7-25].

from the retailers' perspective.   By way of example, the affidavit proffer of Dennis Bassler, Senior Vice President of Merchandising for Albertson's southern California Division affirmed that:

- Albertsons has entered into marketing agreements with several vendors for several different products.

- Albertsons currently has a Sales Growth Incentive Plan with Guerrero Mexican Foods ("Guerrero") and Mission Foods ("Mission") and has had similar agreements in the past.

- The payments made by Guerrero/Mission under the terms of the agreement are not more than the payments made by other product manufacturers which have similar types of agreements with Albertsons.

- Guerrero/Mission uses all of the space allocated to it by Albertsons.

- The agreements with Guerrero/Mission have never been exclusive agreements. None of the terms of the agreements have ever been conditioned upon Albertsons excluding other tortilla manufacturers from its stores. Albertsons is free to contract with any tortilla manufacturer to place its product in Albertsons's stores and has complete control over the terms of any such agreement.

- Albertsons has in the past and will in the future entertain proposals from tortilla manufacturers that are interested in having their product sold in Albertsons' stores.

- The manufacturers of tortillas compete for shelf and store space with thousands of other companies that are interested in selling product in Albertsons' stores.

- Albertsons' stores are limited in space. Accordingly, the decision to place a vendor's product in Albertsons' stores must make good business sense. Further, products must be able to meet service requirements and earn a sufficient return on their space. If the vendor meets our service requirements and the products promise a competitive return either through sales volume,

18

promotional support or fixed payments (or a combination thereof) they will be allocated space.

- An important factor in deciding whether to allocate more space to a category is whether the vendors in that category provide incentive programs and support for advertisements and promotions. Albertsons' agreement with Guerrero/Mission encourages Albertsons to allocate more space to the sale of tortillas.

- Albertsons, not Guerrero/Mission, has complete control of decisions about how much of its shelf space and store space to allocate to the sale of tortillas.

- Albertsons, not Guerrero/Mission, has complete control of decisions about the price at which it offers Guerrero/Mission product to its customers.

- Albertsons, not Guerrero/Mission, has complete control of the schematics and space allocation for its stores.

- Albertsons does not have an agreement with Guerrero/Mission for preferential placement. If Albertsons were to place another manufacturer's tortillas in Albertsons' stores, Guerrero/Mission would not have any right to preferential placement of its product or any right to control the placement of another manufacturer's tortillas.

- In choosing the products to offer, the space to allocate and the prices to charge, it is Albertsons' desire to offer its customers high quality products at the lowest possible price. This is essential to better compete in the retail grocery market. The agreement with Guerrero/Mission helps further to this end.

- Albertsons has the option to advertise Guerrero/Mission product and Guerrero/Mission will pay for the ads. Albertsons' agreement with Guerrero/Mission does not restrict any other tortilla manufacturer from entering into a similar agreement to pay for advertisement at Albertsons' option.

- In the past few years, Albertsons has been approached by other vendors that are interested in selling tortillas in Albertsons' stores. Albertsons offers each vendor the opportunity to place their tortillas in Albertsons' stores if they will agree to terms similar to the agreed upon terms between Albertsons and

Guerrero/Mission and the agreement makes good business sense for Albertsons.

- In the past, Albertsons has had a similar contractual relationship with La Reina, Inc. La Reina was unable to continue in this role and the relationship ended.

- The agreement with Guerrero/Mission is beneficial to Albertsons and Albertsons' customers. It is beneficial to Albertsons because it allows Albertsons to better compete with other retailers in Southern California. It is beneficial to Albertsons' customers because a portion of the benefit goes to the costs of goods sold which allows Albertsons to offer lower prices to our customers. Competition from other grocery retailers effectively forces Albertsons to pass through much of the benefit of the Guerrero/Mission agreement to its customers by offering lower prices.

- Guerrero/Mission must follow the same procedures as all other vendors if it is interested in obtaining approval to place new products in Albertsons' stores.

- Guerrero/Mission does not have any control over the placement of any other manufacturer's product in Albertsons' stores.

The Court concludes and HOLDS that Dr. Gundlach's testimony is inadmissible on several grounds. First and foremost, his opinion is not based on the facts of the case. *See Eleven Line*, 213 F.3d 198; *see also Taylor Publishing Co. v. Jostens, Inc.,* 216 F.3d 465, 485 (5th Cir. 2000). Second, his opinion appears to be based on the assumption that CMA Agreements are a *per se* violation of the antitrust laws. This assumption fails because, even if they were, the link between the violation and the loss of sales is not established sufficiently to avoid being mere guess-work. Reliability means that the expert opinion is based on and supported by what is real and known. The testimony that is relied upon to support Dr. Gundlach's assumptions are the self-serving testimony of the plaintiffs, which

fails to establish a basis for their claim of loss sales. *See Kenner v. Sizzler Family Steak Houses*, 597 F.2d 453, 457 (5th Cir. 1979).

Dr. Gundlach's opinion is based on wholly insufficient data. Dr. Gundlach's opinion does not rely upon the retailers statements or interviews. Nor has he relied upon the testimony of the plaintiffs. He has relied exclusively upon the FTC study, *Slotting Allowances in the Retail Grocery Industry-Study 2003*. Significantly, that study excludes from its consideration private label tortillas sales. *See Slotting Allowances*, at p. 31. Private label tortilla sales account for a substantial part of all retail sales, primarily because the label is owned by the retailers and enjoys primacy on the retailer's shelves.

Lastly his opinion seizes on the abstract and is based on strong opinions that do not relate to market reality. Herein lies a credibility gap. Without doubt, Dr. Gundlach is of the opinion that slotting fees permit unfair competition in the tortilla markets. However, he never brings closure to the relationship between his opinion and the facts of the case. Thus, his testimony must be excluded.

## C.    THE PROFFER OF DOCTOR MCCOIN'S DAMAGE MODEL

Challenging Dr. Kenneth G. McCoin's testimony, Gruma asserts that his testimony should be excluded because: (a) his damage model is not based on Gruma's CMA Agreements that allegedly violate antitrust law; (b) he failed to disaggregate the effects of Gruma's and others' lawful competition; (c) he utilized unreliable assumptions; and (d) as

to three plaintiffs, his business valuations are inadmissible because, admittedly, he has no expertise in business valuation.

At the outset, Dr. McCoin's damage model [14] is not tied to any illegal act that Gruma has engaged in the tortilla market.  For example, there is no indication that Gruma engaged in unlawful conduct in obtaining or maintaining its CMA Agreements.  Nor is there evidence establishing how Gruma's conduct of entering into CMA Agreements has injured the plaintiffs.  Even more telling, there is no delineation in the damage model between those damages claimed as a result of Gruma's CMA Agreements and those where damages may exist and no CMA Agreement between Gruma and a retailer has actually been consummated. Thus, there is no allowance in the damage model for a plaintiff to experience a loss of shelf space due to the plaintiffs' own fault.  For example, the plaintiffs could suffer losses due to lack of service, delivery, poor or damaged product, refusing to negotiate, or never having sought shelf space.  In fact, the evidence fails to establish a single instance where a Gruma CMA Agreement resulted in the plaintiffs' losing shelf space.

---

[14]Dr. McCoin relied upon a Tortilla Industry Association [TIA] study for the foundational data that drives his damage model.  The TIA study was the result of a survey questionnaire that was sent to 517 companies believed to be manufacturers of the tortilla and tortilla brand products.  It excluded companies that produced only fried products such as the tortilla chip, tacos and tostadas.  Forty-seven (47) organizations, large and small, responded.  Other data from independent market research was included and the report was published.  The report concluded that tortillas represented $1.84 billion in sales in 1992.  Of that sum, $1.2 billion was sold to the food services segment of the market  Thus, $.64 billion represents the retail sales market.  The TIA report has been published annually since and shows a growth in the retail sales market from $.64 billion in 1992 to over $1.7 billion in 2002.  It is this annual growth rate that Dr. McCoin uses to determine the growth [loss sales] that the plaintiffs should have experienced.  Thus, the assumption built into Dr. McCoin's damage model is that the plaintiffs' sales growth for the relevant years would proceed at the rate suggested by the market as a whole.

Dr. McCoin acknowledges that other factors have contributed to the changes that he observed in the market.[15] There is evidence that several of the plaintiffs suffered a loss in shelf space to other regional manufacturers due to the increase in tortilla manufacturers and the intense demand for shelf space. In other words, a plaintiff may have been replaced by another regional manufacturer as opposed to Gruma. The evidence is quiet clear that the plaintiffs, within regions, are competing against each other as well as against Gruma.

Another major player in the tortilla market is Bimbo Bakeries U.S.A., Incorporated. Bimbo Bakeries is also a national company that sells bread under the label "Mrs. Bairds." It competes in the tortilla market under the label Tia Rosa. The evidence shows that Bimbo, during the relevant years of this suit, conducted its business with retailers in the same manner as Gruma. The evidence also shows that the plaintiffs are of the opinion that Bimbo was the first to offer slotting fees for shelf space in the tortilla category. Yet, Dr. McCoin's damage model does not make allowance for, or quantify the impact of Bimbo's CMA Agreements. As a result, Dr. McCoin's damage model assigns, indiscriminately, all of the plaintiffs alleged loss sales to Gruma.

The model also assumes that all of the plaintiffs' loss sales are a result of an antitrust injury. The damage model presented simply measures declines in the plaintiffs' sales and attributes them to Gruma CMA Agreements with the retailers. This methodology ignores

---

[15]Dr. McCoin acknowledges that there is an observable decline in the percentage of market growth year after year. He admits that the slowing in the growth rate may be attributable to a saturation of the market by tortilla companies. He also acknowledges an increase in dollars in the market due to an expansion in the market–more customers-more stores.

market realities and other externalities, which are sufficient reasons to exclude Dr. McCoin's testimony. *See Sizzler Family Steak Houses*, 597 F.2d at 457. For example, the record is void of evidence that the plaintiffs were willing or able to handle the demands of a growing market commensurate with the growth shown by the TIA study. In fact, the evidence establishes that they did not and could not. The supermarkets and chain store phenomenon apparently caught the plaintiffs "flat-footed" and they never recovered. And, they admit as much.

In addition, the plaintiffs admit that Gruma is capable of servicing the retailers with hundreds of chain store throughout the state(s). Even Dr. McCoin admitted that the plaintiffs may be losing business to Gruma and other manufacturers due to inefficiency in their marketing and product distribution. This is simply to say that the plaintiffs could not grow fast enough to keep up with growing market demands. In this regard, Dr. McCoin admits: "I do agree that causation–with respect to causation, I can't rule out all these externalities and other things that might account for some of the variances in sales." In fact, Dr. McCoin did not rule out any of the externalities or distinguish between lawful or unlawful conduct on the part of Gruma. *See National Farmers Org., Inc., v. Associated Milk Producer*, 850 F.2d 1286, 1306 (8th Cir. 1988). Nor does he attempt to quantify the extent of alleged harm that is caused by these externalities. Hence, Dr. McCoin's model erroneously presumes that all loss sales are damages that result from Gruma's CMA Agreements with the retailers.

24

## D.   CONCLUSIONS

Because of built-in flaws, the Court is of the opinion that Dr. Gundlach's causation opinions are flawed and that Dr. McCoin's damage model, which relies upon Dr. Gundlach's opinion, is unreliable.  Dr. Gundlach's opinions concerning slotting fees was formed long before this suit was filed.  That fact aside, the opinions are not based on the trial facts, but is merely a recitation of conclusions that do not find sufficient support in the facts.

Dr. McCoin's damage model is based on the conclusion that Dr. Gundlach's opinions are evidentiarily founded.  Because they are not, Dr. McCoin's model constitutes no evidence of damages.  Dr. McCoin's model also suffers from internal flaws.  For example, it ignores the data revealed by the plaintiffs' tax returns.  Thus, his estimates are confounded by the plaintiffs' actual lack of profit.  Moreover, there is no evidence that increases in sales revenue would have found their way to the plaintiffs' bottom lines.  For the reasons stated here and in the record, the Court holds that the testimony of Drs. Gundlach and  McCoin should be and is excluded.

## IV.

## A.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual

disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Id.* at 249-50; *see also Lewis v. Glendel Drilling Co.,* 898 F.2d 1083, 108 (5th Cir. 1990), *cert. denied,* 112 S. Ct. 171 (1991).

Under Rule 56(c) of the Federal Rules of Civil Procedure, the moving party bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.,* 828 F.2d 291, 294 (5th Cir. 1987). Where the moving party has met its Rule 56(c) burden, the nonmovant must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 586-87 (quoting Fed. R. Civ. P.56(e)) (emphasis in original); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Leonard,* 828 F.2d at 294. To sustain the burden, the nonmoving party must produce evidence admissible at trial showing that reasonable minds could differ regarding a genuine issue of material fact. *Anderson,* 477 U.S. at 250-51; 255. *Thomas v. Price,* 975 F.2d 231, 235 (5th Cir. 1992). In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn

in his favor." *Anderson,* 477 U.S. at 255. With these principles in mind, the Court turns to a discussion of the issues.

## B. DISCUSSION AND AUTHORITIES

### 1. *The Standard for Antitrust Conspiracy Claim*

The purposes of the antitrust laws are to preserve and advance the system of free and open competition, and to secure to everyone an equal opportunity to engage in business, trade, and commerce. This policy is the primary feature of the private free enterprise system. The law promotes the concept that free competition produces the best allocation of economic resources. However, it recognizes that in the natural operation of the economic system, some competitors are going to lose business while others prosper. An act becomes unlawful only when it constitutes an unreasonable restraint on interstate commerce. *See Sterns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518, 532 (5th Cir. 1999). To establish their claim the plaintiffs must prove the following by a preponderance of the evidence: (a) that there was a combination or conspiracy between the defendants to restrain trade; (b) that the combination or conspiracy constituted an unreasonable restraint on interstate commerce; (c) that the restraint involved a substantial amount of such commerce; and (d) that the plaintiffs suffered injury in their business or property as a proximate result of the alleged combination or conspiracy. *See* PATTERN JURY INSTRUCTIONS–CIVIL CASES [5th Cir. 1999]. The Court will expand on each of these elements.

A combination or conspiracy is formed when two or more persons knowingly join together to accomplish some unlawful purpose by joint action.  A person acts knowingly if he acts voluntarily and intentionally, and not by mistake or accident. The essence of a conspiracy is an agreement between two or more persons to violate or disregard the law.  A conspiracy cannot be formed unless at least two separate persons or corporations reach an agreement or understanding. Accordingly, a  single corporation cannot agree, combine or conspire with its own officers or employees.  *See Pierce v. Ramsey Winch Co.*, 735 F.2d 416, 425-27 (5th Cir. 1985).

However, one corporation can combine or conspire with another corporation if the two operate as separate entities. But, affiliated parent-subsidiary corporations do not lose their separate existences merely because they are affiliated. *Id.* On the other hand, no combination or conspiracy is possible between corporations that are commonly owned and controlled and that regularly conduct their business affairs in such a manner that they constitute, in effect, a single business entity.   *See Computer Identics Corp. v. Southern Pacific Co.*, 756 F.2d 200, 205 (1st Cir. 1985).

The plaintiffs must also prove that the alleged conspiracy resulted in an unreasonable restraint on interstate commerce.  Here, an unreasonable restraint on interstate commerce must be determined on the basis of a full consideration of all of the facts and circumstances disclosed by the evidence, including the nature of the particular industry or the product or service involved, the market area involved, any facts that are peculiar to that industry,

product, service, or market area, the nature of the alleged restraint and its effect, actual or probable, and the history of the circumstances surrounding the alleged restraint and the reasons for adopting the particular practice that is alleged to constitute the restraint. In sum, the reasonableness of a restraint [the CMA Agreement] is judged by its general effect on the market, not by the circumstances of a particular application.

The third element requires the plaintiffs to prove that the alleged combination or conspiracy constitutes a restraint on interstate commerce involving a substantial amount of such commerce. The term "interstate commerce" refers to business transacted across state lines or between persons having their residences or businesses in different states. *See Hiram Walker, Inc. v. A & S Tropical, Inc.,* 407 F.2d, 4, 8-9 (5 5th Cir. 1969). There can be no violation of the antitrust law unless there is evidence that the challenged activities has actually occurred in interstate commerce or, if only done within one state, that such activity constitutes a restraint on interstate commerce involving a not insubstantial amount of such commerce. *Id.*; *See also Jefferson Parish Hosp. Dist.*, 466 U.S. at 45-46.

Finally, the plaintiffs must establish as a part of its claim that it suffered injury in its business or property as a proximate result of the alleged combination or conspiracy. The antitrust laws are violated only when unlawful competitive practices cause such economic losses. *See Bayou Bottling Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984). Hence, injury is an antitrust injury when the act or transaction constituting the antitrust violation directly and in a natural and continuous sequence produces, or contributes to

29

producing the injury. Thus, proof of an antitrust violation and proof of an antitrust injury must be established independently. There is no antitrust injury unless the illegal behavior reduced competition, even if the behavior violated antitrust law. *See Affiliated Capital Corp. v. City of Houston*, 735 F.2d 1555, 1564 (5th Cir. 1984).

### 2. The Plaintiffs' Antitrust Conspiracy Claim

The plaintiffs contend that the defendants[16] have violated Sections 1 and 2 of the Sherman Act [15 U.S.C. §§ 1 and 2] and Sections 2 and 3 of the Clayton Act, [15 U.S.C. §§ 13 and 14]. Regarding Sections 1 and 2 of the Sherman Act, the plaintiffs assert that Gruma entered into agreements with its subsidiaries or affiliates Mission, Guerrero and Azteca that restrain trade. Such conduct, if it exists, would not necessarily constitute conspiratorious conduct. However, there is no evidence of any such agreements. Moreover, any agreements between Gruma and its affiliates are not on their face, illegal; and, the proffered evidence fails to establish both any agreement and any illegality. Hence, the Court is of the opinion that no conspiracy has been established, and therefore, Gruma is not guilty of violating the Sherman Act by its relationship with its subsidiaries and Azteca.

The plaintiffs claim that Gruma's CMA Agreements with retailers restrain trade because they are a mere pretext. They charge that Gruma is "not offering a better tortilla but

---

[16]All of the evidence shows that Azteca is not a manufacturer of tortillas. Instead it provides corn mesa flour to tortilla product manufacturers, such as the plaintiffs and Gruma. The plaintiffs have failed to present any evidence that Azteca has conspired with Gruma to control the price of tortilla by controlling the price of corn mesa flour. Moreover, there is no evidence that any other illegal agreement exists between Azteca and Gruma. The evidence also shows that Azteca is owned 80% by Gruma, therefore, no conspiracy can exist between the two as a matter of law. The Court dismisses the plaintiffs' suit against Azteca with prejudice and will refer to Gruma Corporation, Mission Foods Corporation and any subsidiaries of Gruma Corporation as "Gruma."

eliminating competition by [the] payment of slotting fees that bear no relationship to any principle, except to eliminate the competition and control the market." The plaintiffs also point to Gruma's internal memoranda concerning Gruma's strategy to secure or improve its market position as evidence of the existence of a monopoly or an attempt to create a monopoly.

Gruma's CMA Agreements and the percentages of market sales that are generated from these Agreements show only that it has utilized acceptable and desirable means to acquire market share. *See S. W. Bell Tele.*, 63 F.2d at 1384. These same methods were used by Bimbo before Gruma commenced using CMA Agreements, and the method is currently being used by several of the plaintiffs. The evidence also shows that Gruma's retail tortilla sales, in relation to slotting fees paid for shelf space, range from one (1) percent to five (5) percent of gross sales. This is not evidence of an intent to exclude competition from the market. Moreover, it is not exclusionary conduct, as a matter of law, in light of the fact that the plaintiffs are also engaging in the same conduct.

The plaintiffs, without saying as much, suggest that Gruma's CMA Agreements are a *per se* a violation of Section 1 of the Sherman Act. In order for the plaintiffs to prove that the CMA Agreements are *per se* illegal, the plaintiffs must show that tortilla customers do not have a choice of tortilla products when making a purchase. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 4-5 (1984). In *Jefferson Parish Hosp.*, Hyde, a certified anaesthesiologist, applied for admission to the staff of East Jefferson Hospital. The hospital

board denied his application because the hospital had entered into a contract whereby all anaesthesiological services were to be performed by a professional corporation. The Supreme Court, speaking to the *per se* violation allegation, noted that there are certain contractual arrangements that may be deemed unreasonable, as matter of law. *Id*. at 10 [N. 10]. The example given by the Supreme Court is one that involves price fixing between competitors or tying agreements. *Id.* at 11. However, it is clear here that no price fixing or tying agreements exist between Gruma and another competitor, or between Gruma and the retailers. Thus, any allegation of a *per se* violation fails.

The testimony by some plaintiffs is that Gruma has entered into CMA Agreements with retailers that provide for "exclusivity." And, as a result, Gruma has "market power" and controls the tortilla category. The whole of the evidence shows that even where Gruma has 50% or more of the shelf space, private labels and other competitors products have the remaining shelf space. By way of example, in southern California in H.E.B. stores, H.E.B.'s own label is the best selling label in the store. The evidence shows that Ralph's, Farmer Jacks, Meyer's and Kroger also have their own tortilla labels on the shelf. This phenomenon is, in the Court's view, evidence that Gruma does not have exclusivity.

Moreover, the evidence shows that Gruma does not have market power. Gruma does not and cannot control the prices of tortillas or exclude the competition from the market. The evidence also shows that other competitor labels are also on the shelves at many of the stores where the plaintiffs assert that Gruma has exclusivity. For example, the testimony of

Collins, Gutierrez and Montes shows that El Milagro, La Fontado, Apidos, Manney's, Tamoros, Torti Mex, La Espiga, Del Comal and Tia Rosa have shelf space in many of the same chain and box stores. In fact, there is no evidence that Gruma has exclusive shelf space in any retail store, except perhaps a box store chain.

The plaintiffs' evidence also fails to establish that the CMA Agreements between Gruma and the retailers have had an actual adverse effect on competition as a whole in the relevant market. In this regard, the plaintiffs rely on the "Rule of Reason" to show that the CMA Agreements between Gruma and retailers create an unreasonable restraint on trade. The "Rule of Reason" requires the plaintiffs to show an adverse impact on the competition. *Quality Markets*, 142 F.3d at 96. The evidence shows that the competition has, in fact, intensified since the early 1990s. While the plaintiffs argue that they cannot compete with Gruma, a national company, they readily admit that new tortilla manufacturers have come into the market since the early 1990s and that the competition between and among the plaintiffs and the new regional companies has intensified. For example, William Chisum, testified that there are 15 or 16 small and intermediate tortilla companies, in addition to La Rosa, that compete with his company, El Aguila. The evidence shows the same to be true in other regions in California, Texas, Arizona and Michigan. As a result of such intense competition, particularly in southern California, the price of tortillas has remained flat. This evidence establishes that one effect of the CMA Agreements is to intensify the competition. The evidence also shows that there is excitement in the tortilla category—new product are

being manufactured and new ideas about marketing and promotion are being entertained. Shelf space has increased and the retailers are more cognizant of the products and the products' impact on the retailers' profitability.

The evidence reveals that the plaintiffs tortillas are on the shelves of many of the retailers where Gruma has paid slotting fees. In spite of this fact, the plaintiffs have not been required to pay for shelf space. The plaintiffs admit that shelf space and table space for increased exposure are negotiated items. And, even when they cannot place a better bid than Gruma, they often share table space with Gruma and other labels at promotional events.

The plaintiffs have failed to sustain their initial burden to show actual adverse effect on competition. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962). Admittedly, the "shake-up" in the market has resulted in some of the plaintiffs losing shelf-space that they enjoyed before competition increased. However, some of the plaintiffs' losses are due to a "self-inflicted" wound–they chose not to compete for shelf space. *Accord TCA Bldg. Co. v. Northwestern Res. Co.*, 873 F.Supp. 29, 38-39 (S.D. TEX 1995). Also, the evidence does not establish that where any plaintiff suffered a loss of shelf space that Gruma was the recipient of that space, or that Gruma's shelf space is disproportionate to its sales. *See Louisa Coca-Cola Bottling Co. v. Pepsi Cola Metro Bottling Co.,* 94 F.Supp. 804, 814-15 (E.D. Ky. 1999). Hence, there is no showing that the market has been unreasonably restrained as a result of the CMA Agreements between Gruma and various retailers.

34

The Court also finds that no adverse effect has been shown supporting the plaintiffs' claims that Gruma has market power. To establish that Gruma has market power of the sort that violates antitrust laws, the plaintiffs' must show that Gruma has the power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hosp.*, 466 U.S. at 14 (citing to *United States Steel Corp. v. Fortner Enterp.* (Fortner II), 429 U.S. 610, 620 (1977) (other citations omitted)). In footnote 20, the Supreme Court referred to market power as leverage where a manufacturer, such as Gruma, has the "ability to induce [its] customer for one product to buy a second product from [Gruma] that would not otherwise be purchased solely on the merit of the second product." *Id.* The plaintiffs appear to argue a slightly different point. They appear to be saying that Gruma is forcing the plaintiffs' customers to purchase Gruma products because Gruma has purchased all of the shelf space. Thus, the plaintiffs assert, Gruma is not competing based on product merit, but on its ability to control shelf space through CMA Agreements.

In this regard, the plaintiffs are required to show that, because of slotting fees, the customers of the plaintiffs and other independents are being forced to purchase Gruma products when in fact they desire the plaintiffs' products. The limited testimony in this area shows that where customers desired a tortilla label that had been removed from the shelf, the customer complained and the store invited that manufacturer back into the store. There is no evidence, beyond speculation, that customers are being denied their choice of tortilla label. In fact, the plaintiffs occupy space on many of the store shelves where Gruma has

product and also in stores where Gruma does not have product.  For example, several of the plaintiffs have exclusivity with retailers.  La Michoacana Espiga and La Michoacana La Ranchera have exclusive shelf space in numerous La Michoacana stores.  Hence, the Court concludes that the plaintiffs' evidence fails to establish that Gruma has market power that violates antitrust laws.

> (3)    *Section 2 - Sherman Act Claim*

Next, the plaintiffs assert that Gruma is violating Section 2 of the Sherman Act and the Robinson-Patman Act by monopolizing or attempting to monopolize the tortilla category.  *See* 15 U.S.C.A. § 2; 15 U.S.C.A. § 13(a).   In this regard, the plaintiffs allege that through promotional fees, slotting fees and shelf maintenance, Gruma has created, maintains or attempts to create a monopoly.   To establish monopolization, a plaintiff must demonstrate that a defendant either unfairly attained or maintains monopoly power.  *See Conwood Company v. United States Tobacco Company*, 290 F.3d 768, 782 (6th Cir. 2002) (citations omitted).  "Monopoly power consists of the power to control prices or exclude competition." *Id.* at 782.  Thus, at the heart of monopolization is the ability to control prices or exclude the competition from the market.  *Id.*  Attempted monopolization is described as an unsuccessful attempt to achieve monopolization that is beyond simple risk.  *See Multiflex Inc. v. Samuel Moore & Company*, 709 F.2d 980 (5th Cir. 1983).  It requires a showing of a dangerous probability.  *Id.*

The plaintiffs have failed to establish that Gruma has monopoly power or the ability to control prices. Moreover, the evidence fails to show that Gruma's efforts, if any it made, reached the level of probable success. In fact, the plaintiffs admit that the price of tortillas is set by the retailer, even in stores where Gruma has over 50% of the shelf space. Thus, the Court holds that the plaintiffs' evidence fails to establish that Gruma has the ability to control prices. Also, the Court holds that Gruma's CMA Agreements are not a restraint on trade such that one may conclude that a monopoly exists, or that any attempt by Gruma at creating a monopoly, resulted in a dangerous probability of success.

The plaintiffs' evidence also fails to establish an interstate commerce nexus. *See Littlejohn v. Shell Oil Co.*, 483 F.2d 1140, 1144 (5th Cir. 1973). There is no evidence that Gruma's conduct in the market in one state affected the market in another state. The Court recognizes that one or more of Gruma's CMA Agreements covers its relationship with one or more retailers in multiple states. However, the evidence fails to establish that any tortilla products crossed state lines, or that any shelf-space provision in the Agreements violates the Sherman Act. Additionally, there is no evidence that a Section 2 violation occurred by exclusivity.

To prove that Gruma has exclusionary power, the plaintiffs must show the exclusionary impact on the consumer and that the impact has impaired the competition in an unnecessarily restrictive way. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). Here again, the plaintiffs' evidence of illegality is lacking. The

fact that Gruma is a national company, larger than the regional companies and, therefore, takes advantage of its size and finances does not establish exclusionary power. These features are merely "consequences of size and not the exercise of monopoly power." *Id.* at 597.

The evidence shows that Gruma is the leader in tortilla sales nationwide and that Gruma's products, sold under the Mission, Guerrero, and La Predilecta labels, are the most popular brands in the United States. The plaintiffs' allegation of exclusionary or monopolistic conduct in interstate commerce overlooks the multi-state retailers' stated preference for a national brand tortilla label around which private and regional labels are marketed. The fact that Gruma, and none of the plaintiffs, could satisfy the service and advertising requirements of a multi-state retailer, is a consequence of size, not monopoly.

The Court holds that Gruma's market share, which is a consequence of its size and ability, does not *unnecessarily* restrict the competition and is no evidence of market power. More importantly, the fact that the plaintiffs have failed and refused to actively compete for shelf space means that the plaintiffs' exclusivity argument is flawed. Hence, the Court determines that these contentions fail.

(4)    *Price Discrimination Under Robinson-Patman*

Finally, there is no evidence that Gruma has engaged in price discrimination. While there may be variance in tortilla prices from community to community or state to state, the evidence that these prices are a contrivance by Gruma to destroy competition is lacking. As

well, there is no evidence that Gruma is selling products below its "average-variable" cost. The Fifth Circuit addressed this issue in *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 532 (5th Cir. 1999), where it held, essentially that a plaintiff must show that a defendant is selling a product below its "average-variable" cost in order to establish exclusionary conduct or predatory pricing. The evidence is undisputed that Gruma has not sold products below average-variable cost and there is no evidence that it intends to increase prices later when and if the competition is configured different. Additionally, the fact that Gruma pays slotting allowance "up-front" as opposed to offering other discounts down the line, has not been shown to reduce Gruma's tortilla sale prices below average-variable cost. Nor is such conduct evidence of price discrimination as outlawed by the Sherman or the Robinson-Patman Acts. In fact, such conduct is the type of competition encouraged by retailers because it results in discounts that are passed on to the consumer.[17]

In a series of miscellaneous allegations, the plaintiffs asserts that Gruma has violated Sections 2(d) and (e) of the Robinson-Patman Act by giving something of value to the retailers' or their buyers, *See* 15 U.S.C. §§ 13(c) and (d). There is no evidence that anything of value was given to the retailers, buyers, or customers beyond coupons and slotting fee

---

[17]The irony of the plaintiffs' positions is revealed in Dr. Gundlach's supplemental report In his supplemental expert report, Dr. Gundlach states that he has reviewed a contract between Gruma and Fred Meyer stores for northern and southern California, Arizona, Nevada and Utah. He observes that Gruma is "required to have the lowest retail price in the subcategory when on promotion." Dr. Gundlach calls this price fixing that "restricts the price of competitors' products during promotions." This is exactly what sale prices are intended to do–cause competitors to reduce or maintain current prices.

allowances.  In instances where it occurred, it was pursuant to contract.  This claim is baseless and will  be dismissed.

(5)     *FRCP, Rule 50 and 52 Claims*

When a party has been fully heard on a claim, a court has the power to enter judgment on that claim.  *See* Fed. R. Civ. Pro., Rule 50 and 52(c).  Such a determination may be based on either a lack of evidence or insufficiency of the evidence.  *Id.*   In the case at bar, the Court and jury heard all of the factual witnesses proffered by the plaintiffs.[18]   Apart from the jury, the Court received proffers from the plaintiffs' expert witnesses.  Hence, the Court has before it the trial evidence, the proffers, the defendants' Rule 50 and 52 motions, and the plaintiffs' response and arguments.  The Court is of the opinion that there is insufficient or no evidence of causation.  Because causation does not exist, no injunctive relief is, otherwise, available.  Therefore, there are no disputed fact issues for the jury.  The defendants' Rule 50 and 52 motions should be granted.  The Court also dismisses the defendants' counterclaim without prejudice, pursuant to FRCP, Rule 41 and the defendants' motions  *See* (Instrument #171).

---

[18]At the end of the day, the plaintiffs announced that they had called their last witness.  The Court informed counsel that the Court wanted to take proffers from the plaintiffs' expert witnesses.  The following day, the plaintiff announced that they were not ready to close their evidence and wanted to offer the testimony of the various plaintiffs' controllers and bookkeepers.  The Court refused to permit this testimony because it did not address causation or damages as originally pled by the plaintiffs.  Moreover, the witnesses were not designated as such and were not presented as possible witnesses until the Court rejected Dr. McCoin's testimony.

**CONCLUSION**

Based on the foregoing discussion, the Court strikes the plaintiffs' experts testimony, grants summary judgment pursuant to FRCP Rule 56(c), grants judgment pursuant to FRCP, Rule 50 and 52, dismisses the defendants' counterclaims without prejudice, and enters a take nothing judgment in favor of the defendants.

Entered this 23rd day of December, 2003.

KENNETH M. HOYT
UNITED STATES DISTRICT JUDGE